EDWARD KIRSCHNER AND EVA KIRSCHNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kirschner v. Commissioner
Docket No. 6821-78.
United States Tax Court
T.C. Memo 1981-201; 1981 Tax Ct. Memo LEXIS 535; 41 T.C.M. (CCH) 1339; T.C.M. (RIA) 81201; April 27, 1981. *535 During 1971, 1972, and 1973, petitioners operated a linen sales business and substantially underreported the income from this business for each of these years. Held: Respondent's determination of additions to tax under section 6653(b) (fraud) is sustained. Burton H. Gilbert, for the petitioners. William P. Hardeman, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income taxes and additions to tax under section 6653(b) [1] (fraud) against petitioners as follows: *536 Additions to Tax
Year
Deficiency
Section 6653(b) [2]
1971
[3] $ 3,037.05
$ 1,518.53
1972
1,051.83
3,185.57
1973
554.78
2,512.86
Since petitioners have conceded the deficiency amounts shown above, the only issue for decision is whether petitioners are liable for additions to tax under section 6653(b). FINDINGS OF FACT Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference. When the petition in this case was filed, *537 petitioners Edward Kirschner (hereinafter sometimes referred to as "Edward") and Eva Kirschner (hereinafter sometimes referred to as "Eva"), husband and wife, resided in Fort Worth, Texas. Edward was born in Poland on October 17, 1932. When Germany invaded Poland in 1939, the families of both petitioners fled from Poland to the Soviet Union. Edward's family was sent to Siberia and considered to be prisoners until Germany invaded the Soviet Union. After approximately two years in Siberia, Edward's family was sent to Uzbekistan in Asia. Eva was born in the Soviet Union in 1941. In 1946, petitioners and their families returned to Poland. Petitioners were later married in Poland. In 1957, petitioners migrated to Israel and, in 1961, petitioners further migrated to the United States. After living in this country for about five years, petitioners became naturalized United States citizens. Edward received two years of basic education in the Soviet Union's schools, as well as three years of basic education and four years of technical training as a draftsman in Poland's schools. While living in Israel, Edward worked as a laborer and as a chauffeur in the armed services. From *538 the time petitioners moved to the United States in 1961 until April 1970, Edward was employed as a salaried draftsman, except for the first year when he worked in the shipping room of his brother-in-law's business. In April 1970, Edward became a partner in his father's linen sales business, which was operated out of his father's garage. Edward's father transferred sole ownership of the linen sales business to Edward in December 1970, but Edward's father continued to exercise control over the business until his death in February 1971. Edward's father was responsible for the 1970 income tax information for the linen sales business. From February 1971 onward, petitioners operated the linen sales business, in which they bought linens from manufacturers and sold the merchandise to major chain stores. Edward did the sales work and Eva prepared invoices and paid bills. Petitioners kept business invoices, receipts, and other similar information in various files, but did not maintain account books (e.g., journals or ledgers) in connection with this business. After the close of each of the calendar years 1971, 1972, and 1973, Edward, assisted by Eva, prepared summary sheets from the *539 business records for use by petitioners' tax return preparer, Walter G. Wilcox (hereinafter referred to as "Wilcox"), a Certified Public Accountant, in the preparation of petitioners' Federal income tax returns. Wilcox prepared petitioners' tax returns for the years in issue from the summary sheets brought to him by Edward without seeing petitioners' business records. Before the years in issue, Wilcox had prepared income tax returns for Edward's father. Petitioners timely filed joint Federal individual income tax returns for each of the years in issue. On July 19, 1974, respondent sent a letter to petitioners scheduling an appointment on August 6, 1974, to examine petitioners' 1973 income tax return. On July 29, 1974, Edward told Wilcox that petitioners' 1973 tax return contained errors. Shortly thereafter, Wilcox prepared an amended income tax return for 1973 using revised summary sheets for the linen sales business supplied by Edward. The amended 1973 tax return included the following explanation: "[t]axpayer inadvertently omitted one month's sales from the totals so that sales for 1973 were understated." Petitioners' amended 1973 tax return was filed on August 2, 1974, with *540 the Internal Revenue Service Center in Austin, Texas. On August 5, 1974, Wilcox informed respondent's tax auditor, Elaine M. Miller (hereinafter sometimes referred to as "Miller"), that an error had been discovered in petitioners' 1973 tax return and, consequently, petitioners were filing an amended tax return for that year. On August 6, 1974, Edward and Wilcox met with Miller and provided her with a copy of petitioners' amended 1973 tax return. A similar sequence of events occurred with regard to petitioners' 1972 income tax return. On September 4, 1974, respondent sent a letter to petitioners advising them that an audit of their 1972 tax return was scheduled for September 20, 1974. After the September 4, 1974, letter was sent, Edward gave Wilcox revised summary sheets for the linen sales business to use to prepare an amended income tax return for 1972. Wilcox began preparing the amended 1972 tax return on September 10, 1974. The amended 1972 tax return included the following explanation: "[t]axpayer inadvertently omitted purchase discounts from cost of sales figures and misstated sales and returns and allowances for 1972." Again, a copy of petitioners' amended 1972 tax *541 return was given to Miller. Petitioners delayed filing the amended 1972 tax return at the request of Miller; the return was ultimately filed on August 16, 1975, with the Internal Revenue Service Center in Austin, Texas. When Edward and Wilcox met with Miller on August 6, 1974, in connection with petitioners' 1973 tax return, neither Edward nor Wilcox indicated that there might be an error in petitioners' 1972 tax return. Wilcox prepared petitioners' amended tax returns for 1972 and 1973 solely from information supplied by Edward. Wilcox did no audit work or record keeping for petitioners in connection with their tax returns for the years in issue. Petitioners did not indicate to Wilcox that they had any difficulty keeping their business records. After auditing petitioners' 1972 and 1973 tax returns, Miller referred these returns to respondent's criminal investigation division. Thereafter, Miller and respondent's special agent, Don Copeland, conducted a joint investigation of petitioners' tax return for 1971. Initially, Edward refused to allow respondent's agents to examine his 1971 business records explaining that he had checked his 1971 tax return and it was correct, but *542 later permitted such an examination. When respondent's agents disclosed at a conference on September 4, 1975, that they believed there was a substantial understatement of petitioners' taxable income for 1971, Edward acknowledged that the figures computed by respondent's agents were very close to the figures that he had computed. Wilcox was not aware that Edward had prepared revised figures for 1971 until Edward disclosed this information at the conference. An amended tax return for 1971 was not prepared. During the course of respondent's investigation, petitioners told respondent's agents that none of the money in the savings account in their name at the University State Bank was theirs, explaining that the money belonged to Eva's father. Petitioners deposited $ 16,547.23 from their linen sales business into this savings account during 1971. In fact, more than half of the money deposited in the savings account during the years in issue was from petitioners' business. Petitioners admitted, later in the investigation period, that the savings account belonged to them. Petitioners reported the interest income from this savings account on their tax returns for each of the years *543 in issue. For the notice of deficiency, respondent's agents reconstructed petitioners' business net profit from petitioners' records. The agents used the accrual method of accounting for each of the years in issue. If petitioners' business net profit had been computed in accordance with the cash receipts and disbursements method of accounting, petitioners' business net profit for 1972 and 1973 and the aggregate of their net profits for the three years in issue would have been greater than that determined by respondent. Petitioners' tax returns for each year in issue (with the exception of the amended 1973 tax return) indicated that the cash method of accounting had been used to compute petitioners' business net profit. Petitioners received gross receipts from the linen sales business as follows: 1971
$ 147,159.19
1972
226,543.98
1973
203,695.41
The net amount of income from the linen sales business not reported on petitioners' original tax returns for each of the years in issue, as determined by respondent and agreed to by petitioners, is shown in table 1. Table 1 1971
1972
Unreported gross receipts
$ 37,641.14 $ 16,448.98 (Understated)/overstated purchases
(18,240.69)
17,484.79 (Understated) freight costs
(3,177.35)
(3,082.59)
Net unreported business income
$ 16,223.10 $ 30,851.18 *544 1973
Unreported gross receipts
$ 33,488.24 (Understated)/overstated purchases
(7,565.85)
(Understated) freight costs
(3,003.53)
Net unreported business income
$ 22,918.86 Petitioners' net unreported business income from their original tax returns amounted to 11.0, 13.6, and 11.3 percent of their business gross receipts for 1971, 1972, and 1973, respectively. Petitioners' net profit from the linen sales business for each of the years in issue, as originally reported, as shown on amended returns, and as determined in the notice of deficiency, is shown is table 2. Table 2 Amended
Notice of
Year
Tax Return
Tax Return
Deficiency
1971
$ 2,335.34
none filed
$ 18,558.44
1972
3,872.81
$ 32,758.66
34,723.99
1973
3,188.51
29,366.75
27,202.38
Petitioners' adjusted gross income for each of the years in issue, as originally reported, as shown on amended returns, and as determined in the notice of deficiency, is shown in table 3. Table 3 Amended
Notice of
Year
Tax Return
Tax Return
Deficiency
1971
$ 2,446.68
none filed
[4] $ 18,669.78
1972
4,416.98
$ 33,302.83
35,268.16
1973
2,738.80
28,917.04
[5] 26,752.67
*545 Petitioners' income tax liabilities for each of the years in issue, as originally reported, as shown on amended returns, and as determined in the notice of deficiency, are shown in table 4. Table 4 Amended
Notice of
Year and Tax
Tax Return
Tax Return
Deficiency
1971 Chapter 1
none
$ 2,627.20
Self-Emp.
$ 175.15
filed
585.00
Total
$ 175.15
$ 3,212.20
1972 Chapter 1
$ 4,934.77
$ 5,986.60
Self-Emp.
$ 290.46
675.00
675.00
Total
$ 290.46
$ 5,609.77
$ 6,661.60
1973 Chapter 1
$ 3,862.02
[5] $ 4,416.80
Self-Emp.
$ 255.08
864.00
864.00
Total
$ 255.08
$ 4,726.02
$ 5,280.80
*546 On January 20, 1971, petitioners paid $ 6,183.92 down on a new home. Petitioners retained their old residence as a rental house. During 1972, petitioners purchased a lot in the DeCordova Bend resort for $ 4,500 and paid for the lot with a single personal check. Petitioners also purchased a lake lot at Sky Harbour for $ 2,600 in 1972; they paid approximately $ 50-100 down on this lot. Petitioners made principal and interest payments on mortgages on both of their houses during each of the years in issue, and also with regard to their Sky Harbor lot during 1973. On July 15, 1973, petitioners purchased a building and lot for use in the linen sales business; the cost of this building and lot was $ 15,000. Edward borrowed $ 15,000 sometime during 1971 or 1972. Petitioners' bank statements *547 showed that the average balance in their checking account at the First National Bank of Fort Worth was $ 8,862 in 1971, $ 11,520 in 1972, and $ 22,730 in 1973. In an application for membership to Sky Harbour Community Club, dated June 9, 1972, Eva stated that petitioners' annual income was $ 10,000. During each of the years in issue, petitioners had two dependent children. A part of petitioners' underpayment of tax for each of the years in issue was due to fraud. OPINION Respondent determined that all or a part of an underpayment in income taxes for each of the years 1971, 1972, and 1973 was due to petitioners' fraud. Petitioners do not dispute that there were underpayments, but deny that there was fraud. We agree with respondent. In order to sustain his determination as to the fraud addition to tax [6] for a year, respondent must prove, by clear and convincing evidence, that some part of an underpayment for that year is due to fraud. Sec. 7454(a); [7]Rule 142(b), Tax Court Rules of Practice and Procedure; e.g., Stone v.Commissioner, 56 T.C. 213, 220 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105 (1969). He need not prove the *548 precise amount of underpayment resulting from fraud, but only that there is some underpayment and that some part of it is attributable to fraud. Lee v. United States, 466 F.2d 11, 16-17 (CA5 1972); Plunkett v. Commissioner, 465 F.2d 299, 303 (CA7, 1972), affg. a Memorandum Opinion of this Court; [8]Otsuki v. Commissioner, 53 T.C. at 105; Estate of Brame v. Commissioner, 25 T.C. 824, 831-832 (1956), affd. per curiam 256 F.2d 343 (CA5 1958). The issue of fraud poses a factual question which is to be decided upon an examination of all the evidence in the record. Plunkett v. Commissioner, supra; Mensik v. Commissioner, 328 F.2d 147, 150 (CA7 1964), affg. 37 T.C. 703 (1962); Stone v. Commissioner, 56 T.C. at 224; Stratton v. Commissioner, 54 T.C. 255, 284 (1970). *549 Fraud is an actual intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. E.g., Webb v. Commissioner, 394 F.2d 366, 377 (CA5 1968), affg. a Memorandum Opinion of this Court; [9]Powell v. Granquist, 252 F.2d 56, 60 (CA9 1958); Wiseley v. Commissioner, 185 F.2d 263, 266 (CA6 1950), revg. 13 T.C. 253 (1949); Estate of Pittard v. Commissioner, 69 T.C. 391, 400 (1977); McGee v. Commissioner, 61 T.C. 249, 256-257 (1973), affd. 519 F.2d 1121 (CA5 1975). This intent may be inferred from circumstantial evidence. Powell v. Granquist, 252 F.2d at 61; Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion, 578 F.2d 1383 (CA8 1978); Beaver v. Commissioner, 55 T.C. 85, 92-93 (1970). Viewing the record as a whole, we conclude that respondent has sustained his burden of showing fraud by clear and convicing evidence for each of the years in issue. There was a substantial omission of business income *550 in each of the years at issue. A "consistent pattern of underreporting large amounts of income" is evidence of fraud. Holland v. United States, 348 U.S. 121, 139 (1954). However, the mere omission of income, even if conceded, is not enough to satisfy respondent's burden of proof. E.g., Goldberg v. Commissioner, 239 F.2d 316, 320 (CA5 1956) revg. a Memorandum Opinion of this Court; [10]Otsuki v. Commissioner, 53 T.C. at 106; Nicholson v. Commissioner, 32 B.T.A. 977, 989 (1935), affd. 90 F.2d 978 (CA8 1937). See Estate of Beck v. Commissioner, 56 T.C. 297, 363 (1971). Consistent and substantial understatement of income by itself is strong evidence of fraud. Webb v. Commissioner, 394 F.2d at 378-379; Merritt v. Commissioner, 301 F.2d 484, 487 (CA5 1962), affg. a Memorandum Opinion of this Court; [11]Estate of Temple v. Commissioner, 67 T.C. 143, 163 (1976). Petitioners reported net profit from the linen sales business totalling $ 9,396.66 for the three years in issue, whereas their true net profit totalled $ 80,484.81 for these years. *551 See table 2, supra. Accordingly, there are substantial understatements of income for three consecutive years, including an overstatement of business expenses for one year (1972), which constitute strong evidence of an attempt to defraud the Government. The gap between the income received and that reported on petitioners' tax returns for each year is simply too substantial for petitioners to have overlooked the understatements when they signed the returns. See Estate of Temple v. Commissioner, 67 T.C. at 164. Moreover, we believe the following additional factors (see Stratton v. Commissioner, 54 T.C. at 286-287) point toward a fraudulent intent at the time petitioners' (original) tax returns were filed: (1) Petitioners had in their possession at all relevant times business records sufficient to compute their business income for each year in issue, and when notified by respondent that their tax returns were going to be examined, Edward responded by promptly providing their return preparer with substantially correct business income amounts for 1972 and 1973 without *552 assistance from third parties. See Plunkett v. Commissioner, 465 F.2d at 301, 303. Evidently, petitioners knew how to make substantially correct computations of business income. (2) Although being forthcoming about errors is no guarantee of avoiding a charge of tax fraud, or even criminal prosecution therefor ( Plunkett v. Commissioner, 465 F.2d at 302-303), petitioners' reluctance in the instant case suggests both a guilty knowledge and a desire to conceal. Petitioners assert that the business income errors on their tax returns for all three years in issue stemmed from their confusion as to the cash and accrual methods. Yet, despite this asserted common cause for all three years' errors, when pressed as to 1973, petitioners sought only to "correct" 1973; when, subsequently, pressed as to 1972, they sought only to "correct" 1972; and the same general sequence was followed as to 1971. (3) Petitioners explain that their errors stemmed from their confusion as to the cash and accrual methods of reporting income. Petitioners' explanation is so unbelievable that it strengthens our conclusion that they committed fraud. At trial, Edward described *553 the cash method as the method he used to compute petitioners' business net profit for the years in issue. We have found, however, that the cash method would have required petitioners to report more business net profits in the aggregate for the three years in issue than that determined under the accrual method by respondent. Under either the cash or the accrual method, it is clear that petitioners substantially underreported their income for each of the years in issue. Petitioners offered no explanation why, if they were on the cash basis, amounts not included in income in one year were also not included in income in the succeeding year. Furthermore, petitioners' amended 1973 tax return contained the explanation that one month's sales had been omitted from the business income reflected on their tax return as originally filed. Such an explanation is not consistent with Edward's claim at trial that he was confused about the methods of reporting income. (4) At the same time that petitioners were reporting minimal amounts of income on their tax returns, they were able to provide living expenses for a family of four, maintain significant amounts of cash in their checking account, *554 purchase several parcels of real property--a new home in 1971 (old home retained as rental property), two vacant lots in 1972, and business property in 1973--and make principal mortgage payments on two houses and one lot. (5) Although petitioners reported adjusted gross income of $ 2,446.68 in 1971 and $ 4,416.98 in 1972 (see table 3, supra, in 1972, Eva represented petitioners annual income to be $ 10,000 to a third party. Petitioners point out that, although they underreported the gross receipts from the linen sales business, they also understated business expenses in two of the years in issue (1971 and 1973). Petitioners argue that this circumstance mitigates against their supposed fraudulent intent. We agree that understatement of business expenses is a factor to be considered in petitioners' favor. However, an understatement of expenses will not preclude a finding of fraud, when it is coupled with a greater understatement of gross receipts. Plunkett v. Commissioner, 465 F.2d at 303-304; Clark v. United States, 211 F.2d 100, 103 (CA8 1954). The net effect of understatements of business gross receipts and expenses in this case was *555 the failure of petitioners to report 11.0 and 11.3 percent of the business gross receipts for 1971 and 1973, respectively. We conclude that petitioners' understatements of business expenses for these years do not counteract the combined force of all the other factors listed above. Petitioners further claim that since Edward was poorly educated and lacked business experience, the understatements in business income were a result of error or ignorance caused by Edward's confusion over the cash and accrual methods of accounting during the years in issue (which were Edward's first years in business without his father). We do not find this argument persuasive. We do not believe that any such confusion is the source of the underreporting that has been conceded in the instant case. [12] Moreover, during the first year in issue, petitioners had lived in this country for ten years and had been naturalized citizens for five of these ten years. Although petitioners may be lacking in some formal education, they were sufficiently intelligent and businesswise to operate a business with gross sales of $ 147,159.19, $ 226,543.98, and $ 203,695.41 in 1971, 1972, and 1973, respectively, and which *556 generated considerable net profit in each of these years. See table 2, supra. Lack of schooling (or status as an immigrant) does not automatically require a finding that petitioners could not have filed fraudulent tax returns. E.g., Webb v. Commissioner, 394 F.2d at 379-380, and cases cited therein; Estate of Temple v. Commissioner, 67 T.C. at 162; Otuski v. Commissioner, 53 T.C. at 111. The fact that the years in issue were the first years Edward operated a business without his father does not convince us that petitioners' failure to report substantial amounts of business income should be overlooked. Petitioners could have sought assistance from a professional (such as Wilcox, who was unaware that petitioners had experienced any difficulty in keeping their business records) but did not do so for three consecutive years.In short, we simply do not believe petitioners were ignorant of their responsibility under the income tax statutes to report and pay tax on all the income of the linen sales business for each year in issue. *557 Petitioners also claim that there can be no finding of fraud in this case because (1) petitioners have not been prosecuted for criminal fraud, (2) there has been no showing of a substantial change in petitioners' net worth, and (3) petitioners made their business records available to respondent at all times. None of these arguments is persuasive. First, the Internal Revenue Code provides separate and distinct civil and criminal remedies for fraud. Helvering v. Mitchell, 303 U.S. 391 (1938). Respondent need not seek prosecution of petitioners criminally in order to assert the addition to tax for fraud in a civil case. Second, respondent computed petitioners' business income using petitioners' business records without resorting to the net worth method of reconstructing income. He is not required to use the net worth method. Third, cooperation with respondent during his investgation does not dissipate petitioners' fraudulent intent at the time they filed their original tax returns. As a final matter, petitioners, in essence, attempt to shift the responsibility for errors in their tax returns to Wilcox, their return preparer. We are not persuaded. Wilcox prepared *558 petitioners' tax returns, including amended tax returns, for the years in issue from summary sheets supplied by Edward. Wilcox neither saw nor reviewed petitioners' business records for any of the years in issue. This is not a case where petitioners relied on the advice or record keeping work of their return preparer. Wilcox functioned basically as a scrivener, placing the numbers supplied by petitioners on the appropriate lines of petitioners' income tax returns. Petitioners maintain that Wilcox should have explained to Edward the difference between cash and accrual methods of reporting. Perhaps he should have. However, as we have already noted, the cash method would have produced even greater net profits than respondent determined. On the record before us, we do not believe the asserted cash-accrual confusion was responsible for petitioners' errors. We do not believe Wilcox was responsible for petitioners' errors. We do believe petitioners were responsible for petitioners' errors. We hold for respondent. Decision will be entered for the respondent. Footnotes
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the taxable years in issue.↩
2. The amounts of what otherwise would have been deficiencies for 1972 and 1973 were reduced when petitioners filed amended tax returns for those years on August 16, 1975, and August 2, 1974, respectively. These amended returns do not effect corresponding reductions in the amounts of the additions to tax. Goodwin v. Commissioner, 73 T.C. 215, 234 (1979). See Papa v. Commissioner, 464 F.2d 150 (CA2 1972); Stewart v. Commissioner, 66 T.C. 54↩ (1976). 3. Of this amount, $ 409.85 is an asserted deficiency in selfemployment tax; the remainder is an asserted deficiency in chapter 1 tax. See table 4, infra↩.
4. So stipulated. At trial and on brief, respondent asserts the amount is $ 299.95 greater. Respondent has not explained this asserted variance from the stipulation. The stipulated amount is consistent with the agreed-to notice of deficiency computations and we see basis for departing from it. See Rule 91(e), Tax Court Rules of Practice and Procedure.↩
5. Petitioners' taxable income for 1973 was determined in the notice of deficiency to be less than that shown on petitioners' amended 1973 tax return. Petitioners' income tax liability for 1973 shown on the notice of deficiency nevertheless is greater than that shown on the amended 1973 tax return, because of a change in the 1971 and 1972 base period incomes for income averaging purposes.↩
5. Petitioners' taxable income for 1973 was determined in the notice of deficiency to be less than that shown on petitioners' amended 1973 tax return. Petitioners' income tax liability for 1973 shown on the notice of deficiency nevertheless is greater than that shown on the amended 1973 tax return, because of a change in the 1971 and 1972 base period incomes for income averaging purposes.↩
6. SEC. 6653. FAILURE TO PAY TAX. (b) Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). * * * ↩
7. SEC 7454. BURDEN OF PROOF IN FRAUD, FOUNDATION MANAGER, AND TRANSFEREE CASES. (a) Fraud.--In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary. [This language reflects an amendment since 1971 which has no effect on the instant case.] ↩
8. T.C. Memo. 1970-274↩.
9. T.C. Memo. 1966-81↩.
10. T.C. Memo. 1954-242↩. 11. T.C. Memo. 1959-172↩.
12. We note that since petitioners maintained an inventory in connection with the linen sales business, they generally must use the accrual method of accounting with regard to purchases and sales. Sec. 1.446-1(c)(2)(i), Income Tax Regs. However, a taxpayer using an accrual method of accounting with respect to purchases and sales may use the cash method in computing all other items of income and expense. Sec. 1.446-1(c)(1)(iv) (a), Income Tax Regs.↩ It is apparent, therefore, that the proper method of reporting petitioners' business income generally would be either the accrual method or a combination of the accrual and cash methods. Petitioners do not contend that they are entitled to use any method other than the accrual method.